**FILED**
**Feb 21, 2019**
**10:55 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT NASHVILLE

| | |
|---|---|
| **Thomas Gilbert,** | ) Docket No. 2018-06-1685 |
| Employee, | ) |
| **v.** | ) |
| **United Parcel Service, Inc.,** | ) State File No. 33590-2016 |
| Employer, | ) |
| **And** | ) |
| **Liberty Mutual Insurance Company,** | ) Judge Kenneth M. Switzer |
| Carrier. | ) |
| | ) |

## COMPENSATION HEARING ORDER GRANTING BENEFITS

The Court held a compensation hearing on February 12, 2019. The issues were whether Thomas Gilbert sustained a compensable aggravation of a preexisting condition at work for United Parcel Service, and if so, his entitlement to permanent partial disability benefits. For the reasons below, the Court holds that Mr. Gilbert's injury is compensable and he is entitled to permanent partial disability benefits totaling $38,610, which represents a permanent impairment of ten percent to the body as a whole.

### History of Claim

Mr. Gilbert works as a driver delivering packages for UPS. He argued he suffered an aggravation of a preexisting degenerative condition. Specifically, he argued that his knee healed from a previous surgery related to a work injury, but frequent climbing into his work truck and walking hastened his need for a total knee replacement.

Mr. Gilbert sustained a work-related injury to his left knee in May 2011. Dr. David Moore, the authorized treating physician, performed an arthroscopic partial medial meniscectomy and chondroplasty and released him to work in October 2011. The parties entered into a settlement agreement providing lifetime medical benefits for the injury. Mr. Gilbert continued to receive authorized care from Dr. Moore. His knee improved over time, and he stopped seeing Dr. Moore in 2012.

1

Mr. Gilbert testified he had no problems with his left knee in 2013 and 2014, but in 2015, he began experiencing pain in his knee when climbing into the truck. Once the pain intensified, he returned to Dr. Moore in July 2015.

In January 2016, Dr. Moore recommended a total knee replacement and referred Mr. Gilbert to his partner, Dr. Gregory Raab, an arthroplasty specialist. Dr. Moore noted at that visit, "My impression is that his [need] for a total knee arthroplasty is directly related to his meniscal injury." Ex. 2 at 11. Dr. Raab saw Mr. Gilbert on April 22, 2016, noting he "works as a Driver at UPS" and his history of surgery, concluding:

> [Mr. Gilbert] had been doing reasonably well until more recently, and over the last several months has had significant increase in his symptoms with pain worsening, both medially and anteriorly with stairs. He describes now the pain is constant. He has difficulty walking. He has difficulty with stairs, which is challenging given the patient's job as a UPS driver, where he is constantly in and out of his vehicle loading and unloading.

*Id.* at 12. Dr. Raab agreed the surgery was necessary and performed it a few months later. Mr. Gilbert returned to his full-time, regular work duties in January 2017.

Mr. Gilbert testified at the compensation hearing that he climbs into his work truck approximately 150 to 200 times per day, five days per week, stepping up approximately eighteen inches. He previously testified that the number of times he climbs into the truck is 150 to 160 times daily. For its part, UPS offered the testimony of Erik Robling, Mr. Gilbert's supervisor, who stated the distance from the ground inside UPS's garage to the first step was fifteen inches. Mr. Gilbert conceded that his measurement was an "estimate." Mr. Gilbert said he stepped up into the truck using his left leg first until he began experiencing left-knee pain in 2015. He explained, "Because of the problems I was having, I switched from starting with my left knee to stepping in with my right leg to take the pressure off that left leg."

Mr. Gilbert sought permanent partial disability benefits based on the impairment rating from his independent medical examiner, Dr. Stephen Neely. In contrast, UPS relied on Dr. Raab's opinion that the need for a total knee replacement related to the 2011 meniscectomy, and therefore the injury is not compensable.

*Deposition Testimony on Causation and Impairment*

Both parties offered medical proof by deposition in support of their positions on medical causation and impairment. Mr. Gilbert submitted the deposition testimony of Dr. Neely; UPS offered Dr. Raab's deposition testimony.

With regard to their qualifications, Dr. Neely recently retired for medical reasons

2

from a thirty-year-plus active practice of orthopedics. Previously, he annually performed about 200 knee replacements. He now provides medical evaluations on a single-visit basis. Dr. Raab remains actively engaged in orthopedic practice specializing in hip and knee joint replacement surgery. Both doctors are board-certified in orthopedics. Dr. Raab participated in a year-long fellowship in joint reconstruction, while Dr. Neely annually attends a seminar on "current concepts in arthroplasty."

Dr. Neely reviewed the medical records and saw Mr. Gilbert once. Dr. Raab performed the knee replacement surgery and saw Mr. Gilbert a total of ten times, including for surgical procedures. Only the April 2016 visit occurred before the surgery, and three of the post-surgical visits were with a physician's assistant.

On the issue of causation, Dr. Raab thoroughly recounted the office notes visit-by-visit. He concluded his direct examination by saying that the cause of Mr. Gilbert's total knee replacement was, by more than fifty percent, the 2011 meniscal surgery, considering all other causes. Ex. 3 at 37-38.

In a combative cross-examination, Dr. Raab equivocated on his understanding of the terms "aggravation," "continuous trauma," and "cumulative trauma." *Id.* at 40-46. Dr. Raab denied knowing much about what Mr. Gilbert did during the period between his 2011 surgery and the time Dr. Raab saw him. *Id.* at 50-51. However, Dr. Raab admitted taking a medical history about Mr. Gilbert's work. *Id.* at 48-50. Ultimately, Dr. Raab concluded he could not apply a percentage on any aggravation of Mr. Gilbert's knee injury because, when he saw Mr. Gilbert, his knee was already bone-to-bone. *Id.* at 55. Dr. Raab stated that he could not attribute all of the wear on Mr. Gilbert's knee to his job "because he had a life outside of his job too that also contributed to wear." *Id.* at 65. He explained, "So I have no way of knowing, as the case with any patient, which part of wear is contributed specifically to one particular event or cycle or repetitive activity because they're all the variables in his knee that are wearing regularly [that] are going to contribute to that." *Id.* at 66.

Dr. Neely arrived at a different conclusion. He described his knowledge of Mr. Gilbert's work activities, especially entering his UPS truck. Ex. 4 at 13-15. Dr. Neely explained the forces that this action would exert upon the knee. *Id.* He concluded that the wear and tear to Mr. Gilbert's knee accelerated with his daily work activities, specifically concluding that more than fifty-one percent of the need for his knee replacement surgery was caused by work. *Id.* at 18-20.

On the issue of impairment, the doctors also widely varied in their assessments. Dr. Raab found a zero-percent impairment, while Dr. Neely found a thirty-one percent impairment. Both ratings were to the lower extremity.

Dr. Raab testified that, one year post-operatively, he had no concerns about the

3

success of the knee replacement and did not "feel that he needed anything further." Ex. 3 at 32. He placed a zero-percent rating at that time. *Id.* at 33. He said at the time he rated Mr. Gilbert's impairment, he was not having any objective problem with the knee except intermittent tibial band tenderness, which he thought was "a very mild problem." *Id.* at 90-91. Dr. Raab expressed "some knowledge" of the AMA Guides to the Evaluation of Permanent Impairment; acknowledged he was not sure of which edition he used; and stated he read "Chapter 16 that deals with knees." *Id.* at 66-67. On cross-examination, he reviewed Table 16-3 of the Guides, Sixth Edition and admitted the Class 0 and 1 columns intersecting with the total knee replacement column are blank. *Id.* at 70, 79. He further admitted that he did not measure the range of motion in the right knee when rating Mr. Gilbert, as recommended in the Guides. *Id.* at 73. On redirect, Dr. Raab said no impairment rating for total knee replacements appears in Class 0 or 1 of that chart. *Id.* at 91. He admitted he had no "specific training" on the Guides. *Id.* at 79.

In contrast, Dr. Neely explained his training on how to use the Guides, Sixth Edition, and his methodology to arrive at Mr. Gilbert's impairment. Ex. 4 at 24-27. He pointed out that Classes 0 and 1 of Table 16-3 of the Guides provide no impairment rating rather than a zero rating. *Id.* at 25. He explained the first section of the Guides for rating a knee replacement indicates a good result with a default impairment of twenty-five percent to the lower extremity, while a fair result indicates a default impairment of thirty-seven percent to the lower extremity. *Id.* at 26-27. Dr. Neely found characteristics of both classes in Mr. Gilbert's case and simply "divided the default ratings," in effect averaging them, to arrive at thirty-one percent impairment to the lower extremity. *Id.* Dr. Neely did not convert this rating to the body as a whole. He conceded that he did not see the x-ray or MRI films but stated they would not change his opinion on Mr. Gilbert's impairment. *Id.* at 87.

### Findings of Fact and Conclusions of Law

Mr. Gilbert has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff,* 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015).

*Compensability*

The threshold issue is the compensability of Mr. Gilbert's claim. To be compensable, an injury must arise primarily out of and in the course and scope of employment. Tenn. Code Ann. § 50-6-102(14) (2018). Mr. Gilbert argued he suffered a gradual injury, which aggravated a pre-existing condition. The Appeals Board explained, "[A]n employee can satisfy the burden of proving a compensable aggravation if: (1) there

4

is expert medical proof that the work accident contributed more than fifty percent (50%) in causing the aggravation, and (2) the work accident was the cause of the aggravation 'more likely than not considering all causes." *Miller v. Lowe's Home Centers, Inc.*, 2015 TN Wrk. Comp. App. Bd. LEXIS 40, at *13 (Oct. 21, 2015).

To determine compensability, a "trial judge has the discretion to determine which testimony to accept when presented with conflicting expert opinions." *Bass v. The Home Depot U.S.A., Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 36, at *9 (May 26, 2017). The Court "is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Id.* When one of those experts is an authorized treating physician, that expert's opinion is afforded a presumption of correctness on the issue of causation. Tenn. Code Ann. § 50-6-102(14)(E).

Here, first considering the doctors' credentials, the Court finds both well qualified. The fact that Dr. Neely no longer performs joint replacement surgery and Dr. Raab continues to do so does not sway the analysis. Nor is the Court persuaded, as UPS contended, that Dr. Raab's fellowship places him in a superior position over Dr. Neely, who annually attended continuing education in arthroplasty concepts. Both doctors have extensive training and practical experience, and this factor favors neither physician.

As for the circumstances of their examinations, Dr. Neely saw Mr. Gilbert once for an independent medical evaluation, while Dr. Raab's records reflect ten visits over the course of twenty-two months. In *Bass,* the Appeals Board cited longstanding law that "[i]t seems reasonable that the physicians having greater contact with the Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Bass,* at *14-15. Here, UPS asserted this places Dr. Raab in a superior position. However, the Court does not attribute greater weight to Dr. Raab's opinions on causation or impairment because of the number of visits, three of which were not with him but his physician assistant. Most of Mr. Gilbert's visits occurred after the replacement surgery, and the issue before the Court is causation. The causation opinions of both physicians stand on their own factual premises and relate principally to the doctors' understanding of Mr. Gilbert's work history and medical history. As for impairment ratings, they find their validity in how the physicians apply the Guides.

Notably in this case, Dr. Raab admitted a lack of knowledge about Mr. Gilbert's work history. However, he maintained his opinion on causation despite being presented with hypothetical situations based on work activities. In contrast, Dr. Neely reported an understanding of the work Mr. Gilbert performed and explained how this activity would create the need for knee replacement surgery. The Court finds Dr. Neely's explanation of causation and its relatedness to work plausible and more persuasive than Dr. Raab's. Dr. Raab exhibited argumentative behavior on cross-examination and needless reluctance to

admit even obvious facts. In addition, he acknowledged he did not know much about Mr. Gilbert's work history. Further, the Court is not persuaded that the height of the first step into the truck—fifteen versus eighteen inches—wholly undermines Mr. Gilbert's credibility or alters the analysis regarding the wear this caused his left knee.

As for the information available to the experts, Dr. Neely's report and testimony revealed that he thoroughly reviewed Dr. Raab's treatment notes,[1] and both physicians performed at least one complete physical examination, placing them on essentially equal footing.

Thus, the Court holds that Mr. Gilbert rebutted the presumption of correctness to Dr. Raab's causation opinion and proved by a preponderance of the evidence that his need for knee replacement surgery arose primarily out of and in the course and scope of his employment. Therefore, UPS shall provide future medical benefits under Tennessee Code Annotated section 50-6-204(a)(1)(A) with Dr. Raab as the treating physician.

*Permanent Partial Disability*

The Court next turns to Mr. Gilbert's entitlement to permanent partial disability benefits and in particular the disputed impairment rating. Determining which rating to accept requires use of the sixth edition of the Guides. Tenn. Code Ann. § 50-6-204(k)(2)(A). The impairment rating assigned by the treating physician is entitled to a presumption of correctness, which is rebuttable by contrary evidence that satisfies a preponderance of the evidence. Tenn. Code Ann. § 50-6-204 (k)(7).

Here, Dr. Raab's zero-percent impairment rating is entitled to a presumption of correctness. However, the evidence is overwhelming that the Guides do not provide for a zero-percent rating for a total knee replacement for several reasons. First, this is clear from review of Table 16-3 on its face; the box is left open and does not contain a zero. Second, Dr. Neely explained that this open section under Class 0 and 1 on Table 16-3 indicates the Guides allow for no total knee replacement that is Class 0 or 1. Even Dr. Raab admitted that Classes 0 and 1 provide no impairment rating.

Dr. Neely assessed a thirty-one percent rating by averaging the difference between default ratings for a good result and a fair result on Table 16-3. Much deposition time involved questioning about Mr. Gilbert's range of motion in the replaced knee, how and when it was measured, and whether any measurement could be correctly noted because measurements might differ from day to day. Importantly, no medical evidence explained that averaging the default ratings was an acceptable method for arriving at an impairment rating. Likewise no medical evidence explained that averaging was not an acceptable method.

---

[1] Dr. Neely did not review the February 5, 2018 office visit notes.

Regardless, the Court must read the medical depositions as a whole and not as an either/or proposition. The Court finds that the evidence rebutted the presumption of correctness afforded Dr. Raab's opinion in a manner that satisfies the preponderance standard. Under the Guides, Mr. Gilbert retains a permanent impairment as a result of his total knee replacement. Determination of the impairment rating is a medical, not judicial, function. The Court must look to the medical testimony for a rating.

Since Dr. Raab's zero-percent impairment rating did not comply with the Guides, the Court looks to Dr. Neely's testimony. Dr. Neely testified that, under Class 2 of Table 16-3, Mr. Gilbert had a good result with a functional knee in a good position. He found a little instability indicated by a clicking sound and felt there was a range-of-motion deficit, which he believed were Class 3 characteristics. Dr. Neely's cross-examination convinced this Court that the instability noted by the clicking sound and the range-of-motion deficit were not sufficient to place Mr. Gilbert in Class 3 or to even find that those Class 3 characteristics existed. Thus, the Court finds that Mr. Gilbert fits into Class 2 of Table 16-3 with a default impairment rating of twenty-five percent to the lower extremity.

Notably, the Workers' Compensation Law provides that impairment ratings be assessed as a percentage of the body as a whole. Tenn. Code Ann. § 50-6-204(k)(3). Dr. Neely did not convert his rating to the body as a whole in his report or deposition. "The Guidelines having been incorporated into the Workers' Compensation Statute, T.C.A. § 50-6-204(d)(3), the Court can take judicial knowledge of the provisions." Smith v. Liberty Mut. Ins. Co., No. 01S01-9408-CH-00079, 1995 Tenn. LEXIS 276, at *3 (Tenn. Workers' Comp. Panel May 31, 1995).[2] This Court takes judicial knowledge of the Guides and specifically Table 16-10 on page 530, which the Court attaches as an appendix to this order.

An application of a conversion chart found in the Guides is not necessarily limited to a physician's opinion. Simply applied, a twenty-five-percent lower-extremity rating converts to a ten-percent whole-body rating. Thus, the Court holds that Mr. Gilbert is entitled to forty-five weeks of disability benefits at the compensation rate of $858 per week, or $38,610, to be paid in a lump sum.[3] See Tenn. Code Ann. § 50-6-207(3)(A).

Finally, as the prevailing party, Mr. Gilbert's counsel submitted an affidavit regarding discretionary costs under Rule 54 of the Tennessee Rules of Civil Procedure. She outlined costs of $1,000 for Dr. Neely's examination, $1,250 for his deposition fee and $615.50 for the court reporter fees for his deposition. Counsel also asserted she believed she paid an additional $1,250 for Dr. Neely for the additional deposition time

---

[2] Section 50-6-204(d)(3) is now codified as section 50-6-204(k).

[3] The parties stipulated that the applicable compensation rate is the maximum rate.

"used by UPS," but she stated she would verify this. Rule 54.04(2) (2018) provides recovery for reasonable and necessary "court reporter expenses for depositions" and "expert witness fees for depositions." However, Dr. Neely's examination fee is not recoverable. *See Garassino v. Western Express, Inc.*, No. M2016-02431-SC-R3-WC, 2018 Tenn. LEXIS 60, at *8-9 (Tenn. Workers' Comp. Panel Feb. 8, 2018). The Court holds UPS shall pay costs of $1,865.50. As for the "additional deposition time," because Counsel needed to obtain verification, on the present record, the Court cannot award the requested amount.

**IT IS, THEREFORE, ORDERED** as follows:

1.  UPS shall pay Mr. Gilbert permanent partial disability benefits of $38,610. Mr. Gilbert's attorney is entitled to a twenty-percent fee of the total award under Tennessee Code Annotated section 50-6-226(a)(1). UPS additionally shall pay $1,865.50 in costs. Mr. Gilbert's attorney may move the Court for an award of additional, verified discretionary costs, unless the parties reach an agreement on this issue.

2.  UPS shall provide future medical benefits with Dr. Raab.

3.  UPS shall pay $150 costs to the Court Clerk within five business days under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (May 2018).

4.  UPS shall prepare and submit to the Court Clerk a Statistical Data Form (SD2) within ten business days of this order becoming final.

5.  Absent an appeal, this order shall become final thirty days after issuance.

**ENTERED February 21, 2019.**

**JUDGE KENNETH M. SWITZER**
**Court of Workers' Compensation Claims**

8

# APPENDIX 1

Exhibits:
1. Wage Statement/Record of TTD payments
2. Composite Medical Records
3. Deposition of Dr. Raab and exhibits
4. Deposition of Dr. Neely and exhibits (causation letter in Ex. 8 for identification only; excluded by court order granting UPS' motion in limine; see technical record #18 below)
5. Joint Petition and Settlement Agreement
6. Ms. Mann's Affidavit re Costs
7. Excerpt of transcript for expedited hearing, July 6, 2016
8. Photograph of first step below the inside truck deck
9. Photograph of truck lower step distance to garage floor-tape measure
10. Photograph of truck lower step distance to garage floor-yardstick

Technical record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Scheduling Order
4. Mr. Gilbert's Motion in Limine-impairment opinion
5. Mr. Gilbert's Motion in Limine-causation opinion
6. UPS' Motion in Limine
7. Mr. Gilbert's Pre-Compensation Hearing Statement
8. Witness List of Defendants
9. Exhibit List of Defendants
10. UPS' Pre-Compensation Hearing Statement
11. Trial Brief of Defendants
12. Notice of Filing Plaintiff Exhibits
13. Mr. Gilbert's Motion in Limine-deposition excerpts
14. Response in Opposition to UPS' Motion in Limine
15. UPS' Reply to Employee's Opposition to its Motion in Limine to Exclude April 26, 2016 Letter
16. UPS' Response to Employee's Motion in Limine to Produce Deposition Transcripts
17. UPS' Response to Employee's Motion in Limine to Exclude the Impairment Opinion of Dr. Raab
18. Order Granting Motion in Limine (Dr. Moore causation letter)
19. Order Denying Motion in Limine (deposition excerpts)
20. Order Denying Motion in Limine (Dr. Raab impairment opinion)
21. UPS' Response to Employee Motion in Limine (causation opinion)
22. Order on Motion in Limine (Dr. Raab causation opinion)
23. Agreed Exhibits and Technical Record-Pretrial Order

9

Excerpt from page 530 of the <u>Guides.</u>

**TABLE 16-10**
Impairment Values Calculated From Lower
Extremity Impairment

| % Impairment | | | | |
|---|---|---|---|---|
| Whole Person | Lower Extremity | Foot and Ankle | Great Toe | Lesser Toe |
| 0 | 0 | 0 | 0 | 0 |
| **Mild** | | | | |
| 1 | 1 | 1 | 8 | 48 |
| 1 | 2 | 3 | 17 | 95 |
| 1 | 3 | 4 | 25 | |
| 2 | 4 | 6 | 34 | |
| 2 | 5 | 7 | 42 | |
| 2 | 6 | 9 | 50 | |
| 3 | 7 | 10 | 59 | |
| 3 | 8 | 11 | 67 | |
| 4 | 9 | 13 | 76 | |
| 4 | 10 | 14 | 84 | |
| 4 | 11 | 16 | 92 | |
| 5 | 12 | 17 | 100 | |
| 5 | 13 | 19 | | |
| **Moderate** | | | | |
| 6 | 14 | 20 | | |
| 6 | 15 | 21 | | |
| 6 | 16 | 23 | | |
| 7 | 17 | 24 | | |
| 7 | 18 | 26 | | |
| 8 | 19 | 27 | | |
| 8 | 20 | 29 | | |
| 8 | 21 | 30 | | |
| 9 | 22 | 31 | | |
| 9 | 23 | 33 | | |
| 10 | 24 | 34 | | |
| 10 | 25 | 36 | | |

## CERTIFICATE OF SERVICE

I certify that a copy of the Compensation Hearing Order was sent to these recipients by the following methods of service on February 21, 2019.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|---------------|---------|-----------|------------------|
| Constance Mann, Employee's Counsel | | | X | cmannlaw@msn.com |
| David Hooper, Employer's Counsel | | | X | dhooper@hooperzinn.com |

Penny Shrum, Clerk of Court
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**

11



<u>Compensation Hearing Order Right to Appeal</u>:

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# COMPENSATION HEARING NOTICE OF APPEAL

Tennessee Division of Workers' Compensation
www.tn.gov/labor-wfd/wcomp.shtml
wc.courtclerk@tn.gov
1-800-332-2667

**Docket #:** _____

**State File #/YR:** _____

_____

**Employee**

v.

_____

**Employer**

## Notice

Notice is given that _____

[List name(s) of all appealing party(ies) on separate sheet if necessary]

appeals the order(s) of the Court of Workers' Compensation Claims at _____

_____to the Workers' Compensation Appeals Board.

[List the date(s) the order(s) was filed in the court clerk's office]

**Judge**_____

## Statement of the Issues

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

## List of Parties

**Appellant (Requesting Party):**_____ At Hearing: ☐Employer ☐Employee

Address:_____

Party's Phone:_____ Email:_____

Attorney's Name:_____ BPR#: _____

Attorney's Address:_____ Phone: _____

Attorney's City, State & Zip code:_____

Attorney's Email:_____

*__Attach an additional sheet for each additional Appellant__*

Employee Name: _____ SF#: _____ DOI: _____

## Appellee(s)

**Appellee (Opposing Party):**_____At Hearing:☐Employer☐Employee

Appellee's Address: _____

Appellee's Phone: _____Email:_____

Attorney's Name: _____ BPR#: _____

Attorney's Address: _____ Phone: _____

Attorney's City, State & Zip code: _____

Attorney's Email: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____ , certify that I have forwarded a true and exact copy of this Compensation Hearing Notice of Appeal by First Class, United States Mail, postage prepaid, to all parties and/or their attorneys in this case in accordance with Rule 0800-02-22.01(2) of the Tennessee Rules of Board of Workers' Compensation Appeals on this the_____day of_____, 20___.

[Signature of appellant or attorney for appellant] _____

Attention: This form should only be used when filing an appeal to the Workers' Compensation Appeals Board. If you wish to appeal a case to the Tennessee Supreme Court, please utilize the form provided by the Court which can be found on their website at the following address: http://www.tncourts.gov/sites/default/files/docs/notice_of_appeal_-_civil_or_criminal.pdf



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name: _____   2. Address: _____

3. Telephone Number: _____   4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____   Relationship: _____

_____   Relationship: _____

_____   Relationship: _____

_____   Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | |
|---|---|---|
| AFDC | $ _____ per month | beginning _____ |
| SSI | $ _____ per month | beginning _____ |
| Retirement | $ _____ per month | beginning _____ |
| Disability | $ _____ per month | beginning _____ |
| Unemployment | $ _____ per month | beginning _____ |
| Worker's Comp. | $ _____ per month | beginning _____ |
| Other | $ _____ per month | beginning _____ |

9. My expenses are:

Rent/House Payment $ _____ per month     Medical/Dental  $ _____ per month

     Groceries        $ _____ per month     Telephone     $ _____ per month

     Electricity      $ _____ per month     School Supplies $ _____ per month

     Water          $ _____ per month     Clothing      $ _____ per month

     Gas            $ _____ per month     Child Care    $ _____ per month

     Transportation $ _____ per month     Child Support $ _____ per month

     Car           $_____ per month

     Other        $ _____ per month (describe: _____)

10. Assets:

     Automobile          $ _____     (FMV) _____

     Checking/Savings Acct. $ _____

     House               $ _____     (FMV) _____

     Other               $ _____     Describe:_____

11. My debts are:

| Amount Owed | To Whom |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____

APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____

NOTARY PUBLIC

My Commission Expires:_____